FRED STOKER, Plaintiff-in-Error, v.
BENNIE LEE HICKS et al., Defendants-in-Error.
—419 S.W.(2d) 626.

Western Section.  March 20, 1967.

Certiorari Denied by Supreme Court August 7, 1967.

444

Homer W. Bradberry, Dresden, Heathcock & Cloys, Union City, for plaintiff in error.

Allen J. Strawbridge, Grooms Herron, Dresden, for defendant in error.

AVERY, P.J.(W.S.). This is a suit originating in the Circuit Court of Weakley County by Mrs. Bennie Lee Hicks, widow of Carlos Hicks, deceased, who was killed or so injured that he died within a few days by the explosion of a boiler, against Fred Stoker and wife, Lillian Stoker. The case on appeal is before us only as relates to the liability of Fred Stoker.

To better explain the procedure of the trial of the case in the lower Court, certain parts of the statement of the case set out in the assignments of error follow:

"On March 7, 1964, Mrs. Bennie Lee Hicks, for her own use and for the benefit of the children of her marriage to decedent, Carlos Hicks, sued Fred Stoker and wife, Lillian Stoker, for damages in the sum of $25,-000.00 in the Circuit Court of Weakley County, Tennessee.

"It is alleged in the common law count, designated Count One of the Declaration, that on July 27, 1963, while working in the tobacco factory on the land owned by the defendants as tenants by the entirety, the decedent, Carlos Hicks, was fatally injured when the boiler used for steaming the tobacco exploded, scalding him so severely that he died seven days later; that the accident and injuries to the decedent were caused by the negligent, careless and wrongful acts of the defendants, in that:

"(a) They knew the aforesaid boiler was defective, and the walls thereof were almost completely rusted 'out', which rusting process had prevailed so long that it had almost completely eaten up the walls, top and bottom, of such boiler.

"(b) That the safety valve on such boiler was rusty and corroded and did not work properly.

"(c) That they persisted in using and operating such boiler in their tobacco manufacturing process, and directed the said Carlos Hicks to work in close proximity thereto, notwithstanding the fact that they knew and had known for many months that such boiler was defective and unsafe, and that it was dangerous for the said Carlos Hicks to work in close proximity thereto.

"(d) They did not furnish the said Carlos Hicks, their employee, a safe place to work, and in which to do and perform the duties they directed him to accomplish as such employee.

"(e) They did not take any precautions or do anything whatsoever with respect to enclosing such boiler in masonry or some other heavy, thick type of compartment, after they knew, or in the exercise of due and ordinary care, should have known, that such boiler was defective and unsafe, so as to afford the said Carlos Hicks protection from an explosion of such boiler.

"(f) They took no steps to have such boiler repaired or replaced, after they knew, or in the exercise of due and ordinary care, should have known, that such boiler was defective, unsafe and dangerous to any one working in close proximity thereto.

"It is alleged in the statutory count, designated as Count Two of the Declaration, that the injuries and the wrongful death of the decedent was directly and proximately caused by the negligent and willful failure of the defendants to comply with and their willful violation of Sections 53-2702, 53-2704, 53-2705, 53-2710, 53-2711, and 53-2712 of Tennessee Code Annotated, which prescribed Rules and Regulations pertaining to the safe and proper construction, installation, repair, use and operation of boilers in the state.

"The defendants interposed to the first or common law count of the declaration their general issue plea.

"To the second or statutory count of the declaration defendants filed a demurrer in which they alleged that the statutes referred to therein had no application to the boiler referred to in the declaration since it was used solely and exclusively for agricultural purposes, to-wit, the steaming of tobacco in its preparation for mailing and sale.

"When on August 28, 1964, the demurrer was first argued, it was overruled by the court with right to rely upon the grounds thereof at the hearing. The defendants were required to plead to the second count of the declaration.

"Thereupon the defendants filed their 'not guilty' or general issue plea to both counts of the declaration.

"Later on December 18, 1964, on motion of the defendants that the trial court reconsider its action in overruling the demurrer, the court sustained the motion to reconsider and then set aside its former action and order overruling the demurrer, and entered an order sustaining the demurrer to the second count of the declaration.

"Thereafter on November 24, 1965, when the case was tried upon the remaining first count of the declaration, the jury returned a verdict in favor of the plaintiffs and against both defendants in the sum of $10,000.00, pursuant to which a judgment was entered against the defendants, Fred Stoker and Lillian Stoker.

"When the matter came on to be heard upon the motion for a new trial seasonably filed, the motion was sustained as to Lillian Stoker, and the judgment as to her was vacated and the suit dismissed as to her, but said motion and all the remaining grounds thereof as to Fred Stoker was overruled and disallowed, to which action of the court Fred Stoker excepted and prayed an appeal which was granted upon the usual conditions."

In the assignments of error, Nos. 1 through 5 are directed to portions of the Court's general charge. In argument, with respect to the separate assignments of error, counsel for the defendant states, "We have undertaken in our assignments of error to underscore the objectional portion of each excerpt from the general charge". This is a rather peculiar way to prepare assignments of error because it requires the appellate court to either copy the entire assignment not underscored and underscored, or simply relate the statement of learned counsel to the fact that the parts of the charge which are objectionable is only that part which is underscored in each of the particular assignments.

In assignment No. 1, the excerpt which is alleged to be error begins with the very first part of the charge of the court, and that which is not underscored relates to the question of the employer failing to furnish deceased a safe place to work "in that":

"the used boiler was improperly installed, and was out of repair, it was not properly equipped, it was not equipped with an ample pop-off or a sufficient steam escape valve or device, it was not periodically inspected * * * the plaintiff's intestate was unfamiliar with the defective conditions of said boiler and unable to realize the danger of such operation, obediently relied solely upon the employers' orders and directions in the performance of his duties and faith in defendants furnishing a safe place to work. Of which defects and unsafe conditions the defendants had notice, or by the exercise of ordinary care under all the facts and circumstances and conditions he was required to observe, he should or would have so known."

In the second assignment of error which deals with the alleged unsafe condition of the installation of the boiler in the involved building, the method of wall construction is set forth as in the charge and the underscoring which counsel says is objectionable is as follows:

"or the way and manner the boiler was operated, or without reasonable inspection, or without safety devices for steam to escape, and as a proximate result thereof the steam boiler exploded, scaled and * * *"

The third assignment deals with instructions of the Court in charging and instructing the jury regarding the negligence of the defendant, and the unfamiliarity of the deceased with the equipment, the underscored part is the statement:

"unfamiliar or unaware with such danger in the operation of such boiler under all the circumstances and conditions which existed at the time, and if you find

from the evidence the deceased relied solely upon the employers' instructions''.

In assignment of error No. 4 the un-underscored part of the charge objected to deals with unpreparedness or no qualification of deceased to perform the work he was pursuing, and the defendant knew it. The underscored and objectionable part of that charge is:

''if you find from the evidence the defendants were aware that the deceased from any cause was disqualified, if you find the deceased was so disqualified to appreciate, realize and appreciate, and avoid such danger.''

Assignment of error No. 5 is to that part of the charge which deals with the alleged assurance of the defendants to repair the boiler, the underscored objectionable part of the phraseology is:

''had a right to rely on the assurance of the defendants, Fred and Lilian Stoker, the master. If you find from the evidence such assurance was given as to the safety of the used boiler and place of work, where the attention of the defendants had been called to such condition of the boiler, and the defendant, Fred Stoker, promised or assured the deceased he would remedy such condition and make the boiler safe or the place of work safe, then the deceased employee did not assume the risk of such unsafe place during the time reasonably required for the performance of such employer's promise.''

The remaining part of that excerpt from the charge which is not underscored:

''unless the danger of such explosion was so eminent that the ordinary prudent man would under the circumstances rely upon such promise or condition to do the work.''

(Evidently the Court meant to have the word "not" immediately following the word "would" and before the word "under" so as to have that part of the sentence to read "would not under the circumstances rely upon such promise")

The undisputed facts in this case with which the combination of the first five assignments of error deal and must be considered, are as follows:

For nine years and a few months prior to the explosion in which Carlos Hicks lost his life, he was employed as a worker on the farm belonging to defendants, Fred and Lillian Stoker. The Stokers grew on the farm, potato slips for sale, tobacco and other crops. The deceased worked throughout the whole operation, including the preparation of the tobacco for market, which operation was likewise carried on on the farm. In addition, the deceased lived in a house, during that nine years plus, that was located there on the farm. He also grew some crops of his own, and for the rent of the land on which Hicks' personal crops grew and the use of the house in which he lived, he paid the defendant, Fred Stoker, one-half of the proceeds of the crops that he grew and marketed himself. When he was not busy in his own crop or working in the crops being grown on that farm by Fred Stoker, he worked in the preparation and harvest of the tobacco that was grown on the land and such other tobacco as Fred Stoker bought from others, in preparing that tobacco for sale and delivery to tobacco users only.

Tobacco was prepared both for chewing and pipe smoking, not for cigarettes or cigars. For the work which the deceased did in the crops, both production and harvesting, and in the preparation of tobacco, he was paid an hourly wage.

Some four years or more prior to this nine year period when deceased lived and worked on the farm and in the tobacco and other crops as stated above, he was employed much of the time by the defendant in doing the same kind of work.

During the first few years of this nine year period the defendant did not have and own the involved boiler that exploded. When deceased first began to work for Fred Stoker, Stoker did not even have a boiler, the tobacco was steamed by the use of an ordinary container such as tub, pots or such vessel in which the hot water was generated by a fire with the tobacco placed over this hot water and the steam moistened it.

Proof is further uncontradicted that when this process with open vessel ceased, Fred Stoker bought the business of one Chadwick, which he used for two or three years, who had been conducting the same sort of processing of tobacco. It later became so out of repair that it was discarded. After that occurred, Stoker bought the same sort of business from one Essary, and in that purchase he obtained another boiler, which he had used some two or three years before it became so inadequate that it would not produce steam for the tobacco, and it was discarded.

After he had discarded the above referred to boilers, he then bought the business of Mrs. Nall, which had been conducted by her husband prior to his death, and in the purchase of this same kind of business from her, he

obtained the boiler involved in this explosion and in this particular lawsuit.

During the time that he had used the boiler steaming process of each of the three boilers, the deceased had worked for him and with him. It had been a part of his work to fire and operate these steam boilers.

The relationship between Stoker and deceased was such that Mr. Stoker says: "Where Carlos went I went, and where I went Carlos went." They had worked together almost side by side for at least these nine years and the record is clear that there had grown up between them not only a relationship of employer and employee, but a relationship that each understood that their job of working together was mutually beneficial to each other and that each knew how to efficiently do the work of the other.

The record does not indicate who helped, if anyone, Stoker dismantle and bring over to his place either the boiler he bought from Chadwick or the one he bought from Essary, but the record is clear and uncontradicted that at the time defendant Stoker bought the boiler from Mrs. Nall, deceased went with him to bring it from Mayfield, Kentucky, to the farm involved. He did not only go with him, but he helped him to dismantle that boiler from its installed location when owned and used in the same kind of business by Mrs. Nall, brought it to the involved farm, left it out behind a portion of the working house on the farm for a few months, which Mr. Stoker says was from December until March or April.

Mr. Stoker built at that time a house in which he operated this tobacco manufacturing process, which was 50 feet long and 30 feet wide, on the back of which was a room or lean-to apparently of the same width, and in

early 1959 this involved boiler was installed with the help of deceased and others, in a portion of this lean-to room, which had a partition in it, separating what is referred to as the boiler room from the working office, and this boiler was installed on a concrete block or mounting. A steam cabinet or a compartment which might be described as a wooden steam chest, was connected with this boiler by a metal pipe, and water was inserted into the boiler by an underground plastic hose attached to a hydrant on the outside of the building, and entered this boiler near the bottom through a pipe to which one end of a rubber hose was attached. This was a short connection between the tobacco steam chest and the boiler.

This record no where describes in any way by words, pictures or otherwise, except in a meager way, the fire box or place where the coal or wood was inserted which built the fire under this boiler. The boiler was an upright boiler, and had no flues through which the heat flowed that heated the water within. This record does not show the water content or size of the boiler. In other words, it does not show how much water this boiler was supposed to ordinarily hold.

It is undisputed that there was a steam gauge in a sort of clock-shape face attached to this boiler that showed or should have shown the steam pressure existing in the boiler at all times when it was fired. There was also a glass tube gauge located somewhere near the upper part of the boiler which showed the level of the water on the inside of the boiler.

The partition wall between what might be referred to as the work office in one end of this lean-to room on the back of the main factory building, was partly composed of a door which was about half glass and the balance of

the wall was constructed of tin or metal of that character, nailed to a 2 x 4, with exception of what is called the steam chest. This steam chest seems to have formed a part of this wall with the opening a sort of a let-down shelf or door inside of which were shelves of some construction, where the tobacco was placed to be steamed, and when apparently sufficiently steamed, this steam chest door was opened and the tobacco taken out, laid on a table, where it was rolled and wrapped in such quantities, twisted, etc., as would fill the orders which had been received by Mr. Stoker.

In filling these orders, Mr. Stoker would prepare the order sheets, showing the number of pounds to go to individual people, the type of tobacco that was to be forwarded, the names and addresses of the people. In other words, he prepared the filling of the orders after the tobacco had been steamed and placed out from the steam chest on the table in the room where he, the defendant, and one of his sons were either standing or sitting.

The proof is undisputed, circumstantially or otherwise, that the operation of this boiler was done as much by deceased, and perhaps more, as stated by some of the witnesses, than by the defendant Stoker.

It is further uncontradicted that the crown sheet of metal, is described as being "the top part of the furnace sheet in the boiler". It is further uncontradicted that on the morning of this explosion, Fred Stoker and two of his sons, Bobby and Ronny, and deceased were at the plant doing the usual type of steaming, wrapping and preparing the tobacco for delivery to customers.

It is further uncontradicted that the deceased was the first one to the plant that morning and build the fire under the boiler. It is further uncontradicted that the

deceased was the last person who went into or came from the boiler room just before the explosion, and it is further uncontradicted that Mr. Stoker was handling the tobacco which had been steamed and doing the wrapping, packaging, etc., getting it ready to ship, and that one of his sons was helping him in that process and the other was carrying the prepared tobacco packages to a truck stationed at the west door.

It is further uncontradicted that this wall between the place where Mr. Stoker and his son were working in which the door was located that led into the boiler room, and which the steam chest formed a part of, was blown out by the explosion; that cinders from the fire box were scattered all over the floor area; that Mr. Hicks or the deceased's body was found lying in a portion of that room with a large piece of timber lying across his legs and his body was wet practically all over.

It is uncontradicted that as a result of this explosion and the wounds received by Mr. Hicks at that time, his body was so scalded with this hot steam from the boiler, great and severe burns were over a large portion or most of his body and caused his death. He was taken from the position in which he was found by his son and a Mr. Cooper,—Mr. Cooper being the first man to locate him after the explosion.

It is further uncontradicted that Bobby Stoker was burned so badly with the hot steam that he almost lost his life. He was in the hospital for 42 days, and that Ronny was blown from his position in the building.

It is further uncontradicted that defendant, Fred Stoker, was burned so badly his life was endangered and he was in the hospital for several days.

Description of the body of deceased by the plaintiff, his wife, at that time, by his son, Wayne Hicks, by Dr. Donner, who took care of him and others, that he suffered greatly before his death; that there were holes in his clothing burned by hot cinders blown by this explosion on to the floor where he lay before being moved after the explosion, and that his pains were excruciating. In fact, they were so described that the trial Judge, in an effort to have the witness then describing how the man suffered, remark from the bench and before the jury during the trial, "anybody with any sense knows that he suffered greatly."

It is further uncontradicted that there had been no difficulty with the operation of this particular boiler during the whole time it had been used in this plant by the defendant and operated by him and the deceased and his sons.

Pieces and parts of this boiler and the equipment attached to it were preserved, being obtained after the explosion and having been made exhibits to the testimony of witnesses at the hearing. Among these are parts of a pipe, the steam gauge, the so-called pop-off or escape valve and parts of metal which composed a portion of that which seems to be the inner lining of the boiler or portions of the crown sheet, the handle of the door that went from the firebox or the boiler and the shirt worn by the deceased at the time of the explosion, but it appears to have been laundered or cleaned since that time. There is also introduced as an exhibit what is described as a modern pop-off or steam escape valve.

There has also been preserved photographs taken of different parts of the equipment that lay in the building after the explosion including the boiler, etc., the actual

photographs or portions thereof, were reproduced in a newspaper and that is introduced as an exhibit, together with all this other material referred to. These exhibits are mostly those to witness Allison, who was a representative of State Department of Boiler Inspection, and who appeared sometime after the unfortunate accident, found the parts which he exhibited, some in the building where the explosion occurred and some at a repair shop or garage to which the equipment had been carried sometime after the explosion.

It is proper at this point to say that no one knows exactly why the boiler blew up, that is, what produced the force. There is expert testimony hereinafter referred to from which it is adduced that the top of the crown sheet, for some cause, gave way emptying the steam and water, one or both, into the hole in the top of crown sheet into the fire box, creating a gas which escaped through this hole in the crown sheet with such force as to form a jet-like propulsion of the boiler through the wall separating the workshop from the boiler room and thereby the hot steam and water was let loose upon the injured parties, including deceased, the defendant and his son, Bobby.

It is said hereinabove that this is an upright boiler and the aforesaid boiler inspector Allison, who first saw this blown up equipment, in Union City, and later in the same place again, when asked to explain what he found, gave the following explanation:

"We found that, or my examination revealed that the crown sheet which is the top part of the furnace sheet in the boiler had ruptured, thereby releasing the steam and what we think caused the explosion. This sheet where it had torn was thin due to deterioration over a

period of years and probably chemical reaction on the sheet. There were other areas around the base of the boiler that indicated had wasted away due to rust externally, particularly around some of the handhold openings. That's about the extent of the examination as far as the boiler.

Q—All right, sir. Now I want to talk to you about a crown sheet. What is the purpose of a crown sheet?

A—A crown—

Q—You'll have to remember now, we're all laymen, and kinda explain it in laymen's language. What is the purpose of the crown sheet?

A—Well actually on a boiler of this type, just what we call a verticle tubeless boiler, in that it has no tubes. It has an outside sheet, and it has an inside sheet, and those sheets are joined together at the bottom by what we call a—actually it was an O.G. ring where it was riveted at the bottom. Now between those two sheets is water. Now inside the furnace sheet and the crown sheet is, of course, your fire. Now when you apply the fire to the sheet and the water, why, of course, you heat the water up to the point where you produce steam, and the crown sheet is the top sheet of the inside furnace sheet.

Q—Well is it a sheet that separates the fire box and the fire from the water?

A—That is correct. It separates the water—it separates the fire from the water.

Q—All right. Now you spoke about this being an upright boiler. Would you explain to the jury on this particular boiler what areas there would hold water,

and how far down around the fire box the crown sheet came, and whether or not it went over the top of the crown sheet, and just explain this to the jury as best you can?

A—May I refer to my record here.

Q—You may, yes, sir.

A.—According to the report we made during the investigation, the verticle flue to this boiler is 24 inches in diameter, 64 inches in length with a single riveted lap-seam longitudinal joint; the furnace was 21 inches in diameter with a crown sheet approximately 48 inches from the base of the boiler. The boiler had a 6 inch smoke outlet through the shell, and this opening was stayed by four staybolts, and two of these staybolts had been welded over on the shell side, and it also had indications where the stays had also pulled during this explosion. Is that the information you wanted?

Q—Yes, sir, but a little more. And around the fire box, like you build a fire in the bottom of the fire box and the blaze, of course, goes up against the crown sheet. That is, if the fire is big enough. Is that correct?

A—That is correct.

Q—All right. Now does the water circulate in this particular boiler around the fire as well as over the top of the fire?

A—The water is in the waterleg between the outside sheet and the inside furnace sheet, and also extends, actually is supposed to extend at least 6 inches above the crown sheet.''

It seems to be the theory of defendant that deceased, Mr. Hicks, was the last one to go into the boiler room to

see what was causing the tobacco which was being processed, not to be steamed; that he, Hicks, did something to the boiler which caused the explosion and practical witnesses, Sam Davis, Dan Harris and Neal Gallimore testified that cold water turned in on a red hot crown sheet would cause the explosion; that deceased must have turned the water in on the hot crown sheet. More will be said about the theory later.

Unless the res ipsa doctrine applies, which will be referred to later, and for the reasons hereinafter stated, we think it does not, then there is no direct testimony from which the jury arrived at its verdict and if the jury and Court are correct, based upon the evidence shown by this record, it would be based upon a fact or facts found from circumstantial evidence, and then a legally factual inference based upon a fact established by circumstantial evidence, properly presented, could and does legally support the verdict.

If we agree with the jury and the Court with respect to the cause of the explosion, the above five assignments of error pose two questions to be determined by this Court:

(1)—Did the deceased discover the inferior condition of the boiler, request defendant Fred Stoker to have it repaired, and receive from him a promise that it would be done within a reasonable time, which was sufficient to have had such repair done prior to the explosion and injury of the deceased?

There is absolutely nothing in this entire record which indicates such request was made by the deceased or that the defendant promised deceased or anybody else that he would have the boiler repaired and the defects remedied. There is nothing to show that either deceased or defendant knew of the inferior condition of the boiler. We

are compelled, therefore, to answer that question in the negative.

Question 2 relates to the assignments of error 1 to five inclusive, and is:

(2)—Did the employer have superior knowledge to that of deceased with respect to the conditions under which the deceased worked, that deceased was working in a dangerous position and defendant continued to direct him to so labor?

■ Under the facts of this case, as relates to the foregoing five assignments of error it is plainly shown by this record that the deceased and the defendant each had as much knowledge as the other, or both had equal knowledge of the makeup, working parts, condition and how to operate the equipment. They had together dismantled this equipment when sold to Stoker by Mrs. Nall. They had together reassembled this equipment at the place where they worked until the explosion. Each had built fires in the fire box, each had turned water into the boiler, each had had the opportunity to observe the boiler under pressure, but neither had ever seen the inside of the boiler, each was acquainted with every operation necessary to condition the tobacco to be delivered to the customers who used it, from the moment the plants were put into the ground and through every process, until it was wrapped and delivered.

Each had had as much experience in the operation of the boiler as the other. The entire lay-out was as familiar to one as to the other and it is undisputed that the defendant did nothing on the day of the explosion to produce such result.

It is insisted that because the defendant had traveled more, particularly during the time of his military service,

with some reference to his mechanical work otherwise than on his farm and in this factory, he possessed a superior knowledge with respect to the working conditions of this machinery and equipment than did the deceased. Since neither of them had any special technical education or training in such matters and that it is not shown that the employer was any better educated than the deceased, this argument strikes us with little force.

In considering the five assignments of error referred to above as one category for our determination, we must remember that at the time the learned trial Court was charging the jury, that both defendants were still before the Court.

Thus it is that in examining the charge of the Court, and the special requests, wherever the plural pronouns are used with respect to the defendants, we will consider them in the singular relating only to Mr. Stoker.

Three persons who claimed to be familiar with boilers of the type of the one here involved, and who had operated boilers at sawmills, wheat threshers and other steam operations, were introduced by the defendant. These witnesses are Sam Davis, Dan Harris and Neal Gallimore.

Sam Davis explained himself as an operator of steam boilers by saying that he was, "raised under them". He said he had operated steam boilers from 1910 to 1923 and named the different kinds as being big boilers cased in and as being traction engine boilers. He explained that the fuel used in some of them was wood and some coal. He had the responsibility of firing and maintaining the boilers. He came and got the involved boiler and carried it to his place of business after the explosion, where it

stayed until the day before the trial. It is assumed he meant the first trial.

He identified the picture of the boiler sitting in an upright position as the one he got at the Stoker farm and carried to his place, as the one involved. He was asked to state whether there was a hole in that picture to the left where counsel had placed it, and he said there was and that was the hole from which the steam gauge came. He also identified two other holes which he said represented the location of the glass water gauge.

He was asked to look at the objects that extended out from the boiler in the picture and state what they were. He explained they were "steam cocks". The opening at the bottom of the boiler he said was the fire door. He also was shown some pipes protruding from near the top of the boiler and he said they were supposed to be "lead-off steam with pop valve on it".

While this record carries many exhibits, some photographic, some metal, nowhere in this record does there appear the photographs about which this witness is being asked. The record does show they are filed as exhibits to Mr. Davis' testimony, at R. 359, 360 and 361. The examination of this witness clearly shows that these exhibits were numbered from 1 to 4 inclusive. The record has been thoroughly searched in an effort to locate such exhibits.

This witness described the steam release valve or pressure valve that was on this boiler, which is exhibited and is in this record as heretofore stated, saying:

"It was a little weight which set down in a case and was a hole come up in it and as the steam raised the pressure, it raised this pop valve. There was no way of it hanging."

He was asked if there was anything mechanical about the pop valve that he saw and he answered that question in the negative. He also was asked whether or not in the operation of this equipment this pop-off valve, in use at the time of the explosion, would begin to allow steam to escape at low pressure, he answered:

"As it come into the contact of the weight of this valve it would go to leaking a light leak, and as the stream pressure raised it would raise it up and let it out."

He further stated that this particular type valve could not be set so as to let the steam out at a particular gauge. He said this was "a weight pop valve and it automatically took care of itself whatever weight it was."

On cross examination he was specifically asked about these particular pictures. They were shown to him. He explained them. He pointed to what they represented. He was asked, if this was sitting on a concrete base, what caused it to be lifted up and go through into the workroom. He answered:

"A—Well, that's your high gas that I was speaking of like a dynamite from a lack of water and throwing cold water on top of the form of gas in the boiler."

Following that question he was asked:

"Q—Now wouldn't there have had to be some escaping steam or gas in order to have propelled it through that wall into that other room, kinda like one of these rockets, there had to be something escaping to propel it, didn't it?

A—When it blowed out, went down through your fire box it hit there and went out through this tube, caught a pressure there.

Q—Alright, now. That's what I'm getting at. So something did break on the inside causing pressure to go down, causing this water or steam to go down, and that just lifted it off something like a rocket, is that correct?

A—That's correct.

Q—Did you make an inspection of the boiler inside of what I will call the water box, or whatever you want to call it?

A—Firebox.

Q—I would call it a water box, the thing that cuts the fire box off from the place where you put the water, did you make an inspection of that?

A—Yes, sir. I looked at that. Your crown sheet on the top and all the way around.

Q—But it did break through that top?

A—Yes, sir.

Q—Was there any rust on the crown sheet?

A—Yes, sir, there was rust on the crown sheet.

Q—Did you just examine the firebox side of it?

A—I checked the boiler all over.''

This witness was tediously examined about the effect of high pressures inside of boilers and he agreed that it could blow up if there was enough steam to do it, but as it relates to this particular boiler, this witness said:

''Well, any boiler would blow up with too much steam, if there's no leak on it, but that wouldn't have carried that much steam on it. It would have come through and went to leaking before it would have blowed up.''

In argument of counsel on cross examination with respect to the crown sheet, the holes, etc., that he observed, he was asked finally and answered:

"Q—But it didn't blow out from the top. It blew down and blew the crown sheet down?

A—That's what I am trying to explain, when a boiler has run dry of water and you throw cold water in them, the first thing it would do is rip the firebox.

Q—Alright. Now, let's suppose—you say that's on the assumption that there's a pop off valve on it and its working properly, is that right?

A—The pop off valve that I have seen will work properly at all times. There's no mechanical failure could be on it.

Q—It wasn't rusty?

A—No, sir.

Q—Then it would work and it couldn't have been anything like that—too much steam that caused this boiler to blow up, is that what you are saying?

A—Yes, sir.

Q—Alright, now, let's suppose, now, that the pop off valve was not working properly, that something had been done to it and it wasn't working properly. Let's put it that way. Could the boiler blow up because it had too much steam?

A—Not the condition that it did blow up. It would have come out through those thin plates at the manhead.''

The whole significance of the testimony of this witness is that the construction of the boiler, as he saw and

examined it and the escape valve or pop-off valve as he called it, that the only way to have fixed this valve so that this boiler would explode, would have been to put a weight on top of this valve head, and he admitted that if there had been a sufficient weight on top of this escape valve, which is shown to have come off of this particular boiler, and sufficient pressure raised inside, it could blow up. But he consistently stuck to the proposition as stated by him, that if this fire had caused such heat on this crown sheet to create, not in his terms, but what he said meant to concave it, as explained by these boiler examiners and the water had gotten out, cold water turned in on the hot crown sheet, it would burst that crown sheet head and explode the boiler.

He was asked on cross examination much about the water gauge or the glass that showed the height of water in the boiler, he explained that all a person would have had to have done to determine if there was sufficient water in it, was to look at that water gauge. He pointed to that part of it in the exhibits that had been filed to his testimony.

This witness said much about the way the cold water was put into this boiler. He was asked much about the hose; whether the hose would have been attached after the explosion, and he said: "I broke all the pipes off". He then was asked much about the rubber hose and how the water could have been inserted. He pointed to a hole in some of these pictures that had apparently been exhibited to his evidence. He was then shown some pictures, and from his testimony and the questions, it is not ascertained what pictures he was being shown, but he was asked:

"Q—Would you point out to me on one of these pictures where it is on the boiler that you make the water connection to put water in the boiler?

A—I don't see none on any of these. These got different sides all of them.

Q—None of the pictures show where you put the water in?

A—There was a hole down close to the bottom on one of them. There's one right there.

Q—In other words, on Picture identified as #4 out on one side there is a thing that sticks out that looks like a water connection that's got an elbow on it?

A—That's right.

Q—That would have been one of the things that you would put water into?

A—Yes, sir."

Again that knuckle was pointed out on what appears to be picture #4 to some other person's testimony, which is found on R. page 418, on which page there are five pictures marked as exhibits. In this picture No. 4 is clearly seen the knuckle he was talking about. He explained the pipe that was screwed on to it had broken threads caused by the explosion. There is exhibited in this record a pipe with one thread end broken off, and about the size of a hose connection. Just whether that is what he is talking about isn't clear.

Mr. Dan Harris gave evidence in behalf of the defendant. He qualified as an experienced operator of different types of milling operations where steam boilers were used and to his ability to repair steam boilers and the observa-

tion of steam boilers over a long period of years. He had examined the boiler involved after the explosion and he discovered the tear in the crown sheet. He supported generally the statements of Mr. Davis. A summary of his whole evidence is that the most common cause of explosions of steam boilers was the turning of water on a red hot crown sheet. He stated that in his opinion that a dry boiler, even with a red hot crown sheet, would not blow up unless cold water was turned on to that hot dry crown sheet, in that a hot dry boiler was not dangerous until water was turned on the hot part of it.

Neal Gallimore explained that he was a machinist and that he had fired steam boilers most of his life. One for the City of Dresden for years and that he had used and worked with both types, upright as well as longitudinal tubes and tubeless boilers. He explained that the most common cause of explosions of boilers was the turning of water on to red hot parts, such as a crown sheet. He said when water hit a red hot crown sheet, that there was a generation of gas, and if sufficient, would be more powerful than any steam that could be generated. He gave an example of what he meant by saying that a metal worker such as a blacksmith, when he would plunge a red hot piece of metal, such as a horseshoe into a water tub for cooling purposes, that a gas is immediately formed, and even this gas so formed would burn on a red hot piece of metal and cause it to crystallize, and that a steam pressure explosion would produce a tear in the weakest part of a boiler. He explained that if steam leaking from a boiler or water leaking from a boiler under pressure where it was rusted out, would be the point of the tear. The meaning of his testimony is that under such circumstances the metal would give away at the weakest point.

It is the rule with respect to negligence of an employer, who is the owner of property, as stated in Buckeye Cotton Oil Co. v. Campagna, 146 Tenn. 389, 394, 242 S.W. 646, 647:

"The owner of property must use reasonable care to see that his place is safe for those whom he invites to come there, and if there are dangers on his premises not obvious to such persons of which he knows, or of which with reasonable care he should have known, it is his duty to give warning of such dangers. Chattanooga Warehouse, etc. Co. v. Anderson, 141 Tenn. 288, 210 S.W. 153; Clapp v. La Grill, 103 Tenn. 164, 52 S.W. 134; Rosenbaum v. Shoffner, 98 Tenn. 624, 40 S.W. 1086; Hines v. Willcox, 96 Tenn. 328, 34 S.W. 420 [34 L.R.A. 824]."

In Buckeye Cotton Oil Co. v. Campagna, the Court was dealing with the question of the liability of the owner of a burning building belonging to the defendants, to help extinguish the fire. The building was located some two miles from the City Limits of the City of Memphis, and the owner invited the firemen from the City of Memphis to come out and extinguish the fire or help in extinguishing the fire:

"This fire was in a wooden seed house or shed. Projecting on either side of the main house was the shed roof, under which a railroad track was laid, and cars were run along this track and under the projecting shed to be loaded and unloaded. The exact width of this projecting shed does not appear, but it was wide enough to cover an ordinary box car and high enough from the ground to permit the passage under it of such a car. The seed house and projecting shed were about 250 feet long. The projecting shed was constructed

somewhat after the style of an awning. It had no support from the ground along its outer edge. The timbers supporting the roof of the shed rested on the wall plate of the wall of the seed house, and extended into the seed house, and nailed to the timbers which supported the roof of the seed house. The timbers supporting the roof of the projection shed were also supported by braces based at an angle of 45 degrees with the upper end of the braces against these timbers and the lower end nailed to the upright studding of the wall of the seed house.

"A large iron pipe about 10 inches in diameter ran from another seed house on these premises, and passed overhead and through the seed house which burned. This pipe was very heavy. It was 22 feet above the ground, and at the burned seed house was supported by a sort of platform, which rested upon the projecting shed. The pipe then passed on through the roof of the seed house. Before reaching the projecting shed this pipe rested on another seed house. The distance between these two supports was 50 feet. There was no intervening support for the pipe. Proof was introduced tending to show that the construction just detailed was bad construction; that in view of the weight of this pipe there should have been an intervening support along this 50 foot stretch; and that the absence of such intervening support put undue weight on the seed house which burned and the projecting shed, and made the pipe more likely to fall.

"Prior to the accident there had been a smoldering fire in some cotton hulls in the seed house which was destroyed. Employees of the plaintiff in error had been watching this fire. During the night on which the

accident occurred the fire got beyond control, and the night watchman at the mill telephoned to the Memphis Fire Department for help. This night watchman, Daniels, also aroused the superintendent of the mill, who lived on the premises, and the latter approved of Daniels' act in calling the fire department.

"Daniels assembled a crew of men, and he was joined by one Beasley with another crew of men. Beasley was a mechanic in the employ of plaintiff in error, and was engaged with several men that night in working on one of the boilers at the plant.

"All these men under the direction of Daniels and Beasley began fighting the fire before the firemen arrived, and for this purpose some of them went under the projecting shed. Beasley concluded that it was dangerous for the men to stay under this shed, that it was likely to fall, and ordered all the men out from under the shed. The firemen got there about this time.

"Two companies from the Memphis Fire Department came out along with Capt. Burke and Capt. Sellas in charge. Chief Fitzmorris and Assistant Chief O'Neil also came out, and were present, directing the operation of the firemen. The firemen went under the shed heretofore described to better reach the fire inside the seed house, and while under this shed almost the entire shed fell, killing Frank Campagna and injuring several other firemen. As heretofore stated, the premises of plaintiff in error were located outside the corporate limits of Memphis. It was no part of the duty of the city fire department to look after fires outside the city limits. As a matter of custom, however, the Memphis Fire Department was in the habit of going to fires out-

side the corporate limits if their services were not at the time required within the city.

"The negligence on which this action is predicated is the defective construction of these premises in not having better supports for the iron pipe mentioned, and a failure on the part of the representatives of plaintiff in error to warn the firemen of the dangerous condition of the shed incident to the progress of the fire and the overhead pipe.

"When firemen or policemen in the course of their duties go upon the premises of an individual, the latter owes no duty to them, except to refrain from inflicting upon them a willful or wanton injury. Under such circumstances within the limits of the municipality by which they are employed, firemen and policemen are authorized by law to go upon the premises of any one in the discharge of their duties."

The Court then said, as stated above, the duty resting upon a person with respect to his property in charge of other persons, showing authorities, then said:

"There is a difference, however, between inviting a friend into one's residence socially or inviting a customer into one's place of business to trade, and in inviting experienced firemen to help put out a fire in a burning building.

"A burning building is not a safe place, and entry into such a place is attended with known dangers. Such dangers are particularly within the knowledge of firemen; who for years have encountered them daily.

"When these firemen accepted the invitation of plaintiff in error and went to its premises to fight the fire they took certain chances. When they went under the

shed of the burning seed house we think they took the chance of the shed falling as the ordinary consequence of the fire. There was nothing unusual in the construction of this seedhouse and shed, leaving the pipe out of consideration; nothing which would render it more dangerous in a fire than many other buildings which all of them had doubtless entered before. Moreover, the men were under the direction of their chief and other officers possessing broad knowledge of all fire perils."

In discussing the falling of the pipe and the shed, he further said that:

"The chief and other officers and members of the fire department present on this occasion testify that this pipe caused the shed to fall down. The employees of the plaintiff in error testify to the contrary, and say that the shed fell because the timbers which supported it were burned where they projected into the seed house, and were nailed as heretofore described. The firemen testify that they did not observe this pipe nor appreciate the danger therefrom when they went under the shed."

After further explanation, the Court, in that opinion, said:

"It is conjectural upon this record whether the fall of the shed let down the pipe or whether the fall of the pipe knocked down the shed, and a verdict cannot be based on a conjecture."

It was contended, as stated by the Court:

"The employees of the plaintiff in error testify that they did warn the firemen that it was dangerous to go under the shed, but that the latter paid no attention whatever to the warning. These employees, however, say that their apprehensions were based on the prog-

ress the fire had made, and that they did not regard the location of the pipe as a menace. However, this may be, it seems to us that advice from these workmen to the Memphis fire chief on this occasion would have been on a par with a suggestion, say from some French peasant in the neighborhood, to Marshal Foch, as to his plan of battle and the danger incident to the attack, and would have been about as much appreciated."

The Court reversed the verdict and judgment and dismissed plaintiff's case.

A motion had been made at the conclusion of all the proof for a directed verdict in favor of the defendant, there having been a judgment for the plaintiff below, an appeal of that judgment having been reversed by the Court of Civil Appeals for errors in the charge of the Trial Court and the case remanded for new trial. Both parties filed petitions for certiorari. The plaintiff in error insists, among other things, that a motion for directed verdict in its favor should have been sustained by the Trial Court, and that Court of Civil Appeals erred in not so holding. The defendant in error contends that the Court of Civil Appeals erred in failing to affirm the judgment below. The Supreme Court held that judgment should have been directed in favor of the defendant.

The deceased was a member of the fire department of the City of Memphis, and met his death while he and his associates were fighting a fire on the premises of the plaintiff in error in September of 1918.

It seems to us that insofar as the foregoing assignments of error, to paraphrase in a way the language of the Court with respect to the suggestion relating to Marshal Foch, that, for Mr. Stoker, when he told Mr. Hicks, on discovery that the tobacco being handled was dry,

"Carlos, go check things", to have at that time called his attention to the fact there was a boiler in there with steam in it or with water in it; that it might be insufficient water or too much pressure, would have, insofar as Mr. Hicks is concerned, amounted to just as much as it did for these peasants to inform Marshal Foch of the danger of the battle which he was about to enter for himself and his men.

For Mr. Stoker to have admonished Mr. Hicks of the possible danger with respect to this boiler, when Hicks knew as much about it and perhaps a great deal more than Stoker himself; had helped take it down at Mrs. Nall's; had helped set it up at Stokers, and had worked on it or worked with Stoker about it for three or four years, Mr. Hicks would likely have thought, "well brother, are you kidding me".

There is another matter that has given us some concern with respect to the charge of the Trial Court, which was given at a time when both Mr. and Mrs. Stoker were defendants. No where in his charge did he ever use the singular pronoun "her" or "him" nor did he ever charge the jury that if they found for the plaintiff they might render a judgment against either Mr. Stoker or Mrs. Stoker, even though there was not one line of proof which could possibly have resulted in a verdict against Mrs. Stoker, if her defense had been given proper consideration by the jury. She stated without any equivocation that she had taught school for eleven years and that she had never had one thing to do with the tobacco business. She just knew that her husband had that little tobacco operation. She stated that she never owned any interest in it; never exercised any control over the tobacco business; never personally received any of the proceeds from the

tobacco business and that her husband was the owner of it at all times and was in the business before she married him, and that it was wholly his business, supervised and operated by him. That is the meaning of her testimony.

She further stated that she never had any interest in the farming operations and never exercised any control in the cultivation of the crops and that the deed was executed solely for the purpose to create entirety tenantship so she would have the farm if she survived her husband and no other evidence even remotely, by inference or otherwise, could she be legally responsible for the work of the deceased, the time he put in at such work, nor to the plaintiff for any injury that was caused which brought about the death of plaintiff's decedent.

It is hard then to understand why the Court refused to direct a verdict in favor of Mrs. Stoker at the conclusion of all the proof, for the motions for directed verdicts were as follows:

"MR. BRADBERRY: If your Honor please, at the conclusion of all the evidence in the case, comes the defendant, Lillian Stoker, by and through her attorney and moves the Court to direct a verdict in her favor in this cause.

"THE COURT: I'll overrule the Motion.

"MR. BRADBERRY: All right, please note our exception. If your Honor please, at the conclusion of all the evidence in the case, comes the defendant, Fred Stoker, by and through his attorney and moves the Court to direct a verdict in his favor in this cause.

"THE COURT: I'll let the Motion be overruled.

"MR. BRADBERRY: Please note our exception."

The jury was brought back and the Court proceeded to charge the jurors without at any place separating Mr. and Mrs. Stoker by the use of singular pronoun or by name.

With the Court later, on motion for new trial, directing a verdict for Mrs. Stoker and letting it stand against Mr. Stoker is some indication that the jury must have thought they had to return a verdict against each of them, and were motivated by sympathy, malice, caprice or undue influence. If the jurors were as to her, then they were as to him.

If we strip the allegations in the declaration for which there is no proof to support, and strip the proof of all that supports no allegation of negligence, we have here employment of plaintiff's intestate when about 50 years of age, and 64 at the time of the accident, who was employed continuously in helping the defendant do the same kind of work in the tobacco curing process and farming for a period of over 14 years, and who had done more than half of the work in firing the boilers by building fires in the fire chamber, the induction of water, the release of steam into the tobacco steam chest, and who on the day the explosion occurred, was the only individual who had the management of that particular equipment from before the fire was built in the morning to the moment of explosion; was the only person in the room where this particular equipment was located; had gone there at the request of his employer, who had discovered that insufficient steam was reaching the tobacco in steam chest, and who had as much or more knowledge of the condition of that equipment as did the defendant, Fred Stoker, his employer, and who had done the same thing for about four years to the same boiler.

The record reveals, as hereinbefore stated, that these two, employer and employee, had worked together with at least two other boilers of a similar type, and when shown to be inefficient, were discarded, prior to the time the one here involved was obtained and put in operation.

The Court, by its charge, permitted the jury to determine whether or not the employee had observed and had called attention to his employer the defective condition of the involved boiler, and had a promise from his employer that it would be repaired, and if they found that issue in favor of the deceased to the extent that the employer had not kept his promise within a reasonable time, he would be liable.

There is not one intimation or suggestion in the entire record that employee or anyone else ever suggested or complained in any wise to the employer, defendant Fred Stoker, that the boiler was insufficient, worn, dangerous, or that deceased did not want to work with it or around it. Nothing in the record even suggests that such condition happened, prior to the involved occasion. Furthermore, there is not one particle of proof in this record that such conversation ever occurred or that Stoker ever made any such promise or was requested to.

There is proof in this record that the boiler was old and had some rusty and worn walls in the firebox, but not one word of such condition was ever discovered by the deceased or ever called to the attention of the defendant by him or any other person.

The boiler did explode and deceased was burned, from which burns he died, all of which is more fully explained in this opinion hereinbefore. If the mere fact that the boiler exploded is substantial proof that it was so inefficient that the explosion within itself furnished sufficient

knowledge to the owner that it did have defective condition, then it furnishes no less knowledge that deceased was fully aware of its condition.

██ As stated, deceased was the last one to use it immediately before the explosion, consequently it was not under the exclusive control of the defendant on that particular day. He had not touched it, he had done nothing to, in any wise, regulate the steam, the condition of the fire, and trusted the correction of whatever adjustment the boiler needed at that time, to his employee, a worthy man.

If it may be inferred that somebody did something that caused the boiler to explode, but can it be further inferred from that inference that defendant, Fred Stoker, or any of his sons who were working there with him did it?

The regulation of that particular boiler was not done anywhere except in the boiler room. There was nothing to cut the steam off, cut it on, or to increase the fuel to the fire in the fire box that could be regulated from any space in the building or outside except in the boiler room itself. The same kind of work was being done by the same two older gentlemen and the two younger boys of the defendant that had been done on this equipment without any indication of danger of an explosion since it was installed at that place by the deceased and the defendant working together, who had dismantled it and brought it there.

We believe that Judge Anderson fully understood the theory of liability that existed between the employer and employee when he wrote the opinion in Draper v. Louisville & N. R. Co., 17 Tenn.App. 213, 216, 66 S.W.2d 1003, 1005, when he said:

"The risks assumed by an employee are of two kinds, ordinary and extraordinary. The ordinary risks are those that are normally incident to an occupation in which an employee voluntarily engaged. An employee is conclusively presumed to have knowledge of such risks and assumes the risk of injuries arising therefrom."

If that statement is true, then in order for this defendant to have been held liable, under the theory of liability as alleged in the first count of the declaration and the proof in this record, to recover, certainly it would have to be proven that the discovery of that type of a situation was made by the deceased and that he had actually requested a correction of whatever condition then existed that brought that knowledge home to him. Secondly Judge Anderson said:

"Among extraordinary risks are those arising out of the failure of the employer to exercise due care with respect to providing a safe place to work and suitable and safe appliances for the work. Such risks are assumed by the employee only when he has knowledge of them and dangers arising therefrom, or when the risks and the dangers are so obvious that an ordinarily prudent person under similar circumstances would have known the risk and appreciated the danger arising therefrom."

He further said:

"If an employee becomes aware of the risk and dangers arising from the negligent act of a fellow servant, *or if the risk and dangers arising therefrom are so obvious that an ordinarily prudent person under similar circumstances would have observed the one and*

*appreciated the other, then, under* the federal statute as construed by the United States courts, the employee assumes the risk arising from such negligent act of his co-employee.'' (Emphasis added.)

Abundant authorities are cited in that opinion to support both classes of risks and accompanying activities which Judge Anderson said would exonerate the employer on the ground that employee had assumed the risk. He did have in this case the consideration of the Federal Employers' Liability Act, but omitting that fact, there is no difference that can be discerned legally, when you strip that opinion of the mere fact that it was covered by Federal Employers' Liability Act, and that of the employer and employee in the ordinary course of any other business.

It is further true that the element of danger observed by the employee in that case was the negligence of one of his fellow employees, but regardless of the fact that the danger was there and was observed by the injured employee no less decreases the liability of this employer, if any at all exists.

█ We think the Court, when he said to the jury that:

''While the master is under the duty to use active diligence to prevent improper or unsafe machinery or an unsafe boiler to be used by or become—to be used by which or because of such use an employee may be injured, and although he is liable for such proximate injuries resulting from such defective defects occasioned by his negligence, which might have been known or discovered by the application of due care and prudence on his part in the application of the ordinary and approved tests, but he is not liable for defects which were unknown to him, and could not have been discerned by due diligence. He is not an insurer of the

safety of machinery or boiler or equipment on the premises, but his liability is measured by what he could have known or discovered by the exercise of ordinary care and prudence, inspection and due and proper concern.''

That he carried the doctrine of assumed risk too far, unless he had gone further and stated to the jury what the theory of the plaintiff was with respect to his duty and type of tests which he would be supposed to make in order to determine whether he was furnishing an improper tool or equipment from which the injury of the plaintiff's decedent resulted.

We are further of the opinion that the Court did err when he said to the jury:

"Now the deceased employee, Carlos Hicks, however, had a right to rely on the assurance of the defendants, Fred and Lillian Stoker, the master. If you find from the evidence such assurance was given as to the safety of the used boiler and place of work, where the attention of the defendants had been called to such condition of the boiler * * *''

was improper and went beyond the proof in this particular lawsuit, or that which might be inferred from the proof and no proof anywhere in the record indicates that any such conversation occurred nor that by which any assurance was given by the employer whatsoever, nor which as would have required or called for any reply or promise. Certainly, coupled with the further fact that in the same paragraph he further said:

"* * * and the defendant, Fred Stoker, promised or assured the deceased he would remedy such condition and make the boiler safe or the place of work safe, then

the deceased employee did not assume the risk of such unsafe place during the time reasonably required for the performance of such employer's promise.''

As we have said before, there is no item of proof that any such conversation ever took place; that any such request was made or any such promise exacted or granted and to so hold would be pure speculation.

In view of our conclusions with respect to the first five assignments of error that there is no substantial proof in the record to sustain a verdict against either Mr. Stoker or Mrs. Stoker, we know of no necessity to extend the length of this opinion, which is now far too long, by considering the assignments of error which attack the charge of the Court or which are levelled at the refusal of the Court to give in charge the special requests by defendant complained of in the remaining assignments of error.

Assignment of error No. 12 attacking the action of the Court in overruling the motion of the defendant, Fred Stoker, for a directed verdict in his favor made at the conclusion of all the proof is sustained.

It is our opinion that deceased assumed the risk and, therefore, the motion for directed verdict should be granted on that ground.

It is further our conclusion that the verdict should have been directed because there is no proof in the record to the effect that any promise to repair the boiler was ever made, and that complainant's intestate never made any suggestion to the defendant that his place of work was unsafe or that the boiler was inferior in any way.

The verdict of the jury and the judgment thereon are reversed and set aside and this case is dismissed at the cost of original complainant, defendant-in-error.

Enter judgment accordingly.

Carney and Bejach, JJ., concur.